IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASSANDRA LORRAINE ROSE,

                Plaintiff,

        v.

DR. MARK PATTON *et al.*,

                Defendants.

Case No. 2:19-cv-01195-SB

**OPINION AND ORDER**

---

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiff Cassandra Rose ("Rose"), a self-represented litigant in the custody of the Oregon Department of Corrections ("ODOC"), filed this civil rights action against several ODOC officials ("Defendants"). Rose alleges negligence and violations of her constitutional rights under the First, Eighth, and Fourteenth Amendments. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, and all parties have consented to the jurisdiction of a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636.

Now before the Court is Defendants' motion for summary judgment (ECF No. 40), Rose's motion to deny Defendants' motion for summary judgment (ECF No. 46), and Rose's motion to appoint an expert witness (ECF No. 50). For the reasons that follow, the Court grants

PAGE 1 – OPINION AND ORDER

Defendants' motion for summary judgment, denies Rose's motion to deny Defendants' motion for summary judgment, and denies Rose's motion to appoint an expert witness.

## BACKGROUND[1]

Rose is an adult in custody ("AIC"), currently housed at the Snake River Correctional Institution ("SRCI"). In January 2017, Rose submitted a non-emergency health request complaining that she was experiencing lower back pain. (Decl. of Donita Flowers ("Flowers Decl.") ¶ 3, ECF No. 42.) On July 6, 2017, Rose was prescribed Abilify to take in the evenings. (Flowers Decl. ¶ 4; Att. 2.)

On July 17, 2017, after taking her evening medication, Rose fell out of her top bunk bed while heavily sedated. (First Am. Compl. ("FAC") at 3.) Jail staff discovered Rose on the floor of her cell, and she was taken to the emergency room where she received a CT scan of her neck and lumbar spine. (Flowers Decl. ¶ 5; Pl.'s Resp. to Defs.' Mot. Summ. J. ("Pl.'s Resp.") at 1.) The CT scan revealed chronic L5 pars spondylolysis, and suspected small posterior disc bulges at L2-3 and L5-S1. (Pl.'s Decl. ¶ 7; Exs. 5, 7.) Rose was diagnosed with a neck muscle strain and a lumbar paraspinal strain. (Pl.'s Resp. at 1; Ex. 5.)

The next morning, Rose returned from the emergency room and was transported back to the prison's medical unit in a wheelchair. (Pl.'s Decl. ¶¶ 8-9.) When she arrived, prison staff told Rose that she would be returning to the top bunk. (Id. ¶ 11.) Rose informed prison medical staff that she was unable to climb a ladder, and she was temporarily assigned to a lower bunk. (Id. ¶ 12.)

///

---

[1] Unless otherwise noted, the following facts are either undisputed or presented in the light most favorable to Rose.

That same day, Rose filed a grievance asking ODOC to put railings on the top bunks to prevent AICs from falling and requesting compensation for her pain and suffering. (*Id.* ¶ 13, Ex. 1.) On July 24, 2017, medical staff evaluated Rose for back pain, and they referred her to defendant Dr. Mark Patton ("Dr. Patton"), for a low bunk request. (Flowers Decl. ¶ 7; Att. 5.)

On July 30, 2017, Rose fell out of the lower bunk, but she sustained no new injuries. (Pl.'s Decl. ¶ 14.) The next day, Rose sent a non-emergency health request complaining of back pain and requesting a low bunk restriction. (*Id.* ¶ 15; Ex. 18, at 1.) On August 2, 2017, medical staff denied Rose's request, noting that there is "no medical reason for a low bunk at this time." (*Id.* ¶ 16; Ex. 18, at 3.) On August 4, 2017, Rose filed a grievance regarding the denial and again requested a low bunk restriction or that ODOC put railings on the top bunks. (*Id.* Ex. 2.)

On August 9, 2017, Dr. Patton evaluated Rose for back pain. Dr. Patton assessed chronic acute and low back pain and noted that Rose's reflexes were intact at her knees and strength was intact at her lower extremities. (*Id.* ¶ 19; Ex. 13, at 4; Flowers Decl. ¶ 8; Att. 6.) Dr. Patton found no medical reason that would require a low bunk restriction. (Pl.'s Decl. ¶ 19; Ex. 13, at 4; Flowers Decl. ¶ 8; Att. 6.) On August 18, 2017, Rose's prescription for Abilify ended. (Flowers Decl. ¶ 9; Att. 2.)

On August 31, 2017, Rose was seen by Dr. Patton to follow up on her emergency room records from the July 17, 2017, fall. (Flowers Decl. ¶ 10; Att. 7; Pl.'s Decl. ¶ 20; Ex. 13, at 5.) The emergency room report was unavailable at that time and Dr. Patton submitted another request for the report. (Flowers Decl. ¶ 10; Att. 7; Pl.'s Decl. ¶ 20; Ex. 13, at 5.) Dr. Patton noted that Rose continued to experience back pain. (Pl.'s Decl. ¶ 20; Ex. 13, at 5.)

///

///

Between September 2017 and January 2018, Rose continued to file grievances requesting a low bunk restriction or that the prison install railings on the top bunk (*id.* ¶¶ 21, 23-30; Exs. 1B, 2B, 2D), all of which were denied. (*Id.* Exs. 1A, 1C, 2A, 2C, 1E, 2E.)

On January 16, 2018, Rose slipped off the ladder while climbing into the top bunk and fell, sustaining injuries to her face and head. (FAC at 4; Pl.'s Decl. ¶ 31.) On January 19, 2018, medical staff evaluated Rose to follow up on her head injury. (Flowers Decl. ¶ 13; Att. 9.) Rose again requested a low bunk restriction, which was denied. (*Id.* ¶ 13; Att. 9) Two days later, Rose filed a grievance regarding the incident and again requested a low bunk restriction. (Pl.'s Decl. ¶ 32; Ex. 3.)

On January 23, 2018, Rose sent a non-emergency health request informing medical staff that she was experiencing back pain. (*Id.* ¶ 33.) On January 29, 2018, medical staff evaluated Rose. (*Id.* ¶ 33; Ex. 13, at 7.) Rose informed staff that her pain was "constant all along [her] lower back" and that her current treatment plan of capsaicin cream and ibuprofen was no longer working to alleviate her symptoms. (*Id.*; Flowers Decl. ¶ 14; Att. 9.) Progress notes from the visit indicate Rose had a steady gait and could sit in a chair. (Pl.'s Decl. ¶ 33; Ex. 13, at 7; Flowers Decl. ¶ 14; Att. 9.) Medical staff informed Rose that they would continue with her current treatment plan. (*Id.*)

On March 19, 2018, Rose informed a nurse that her back was still hurting and the pain was preventing her from exercising. (Pl.'s Decl. ¶ 38; Ex. 13, at 8.) The nurse observed that Rose exhibited an equal gait and was able to move up and down from the exam table without difficulty. (*Id.*; Flowers Decl. ¶ 15; Att. 10.) That day, Dr. Patton evaluated Rose for lower back pain and recommended Tylenol and ibuprofen. (Flowers Decl. ¶ 15; Att. 10.) On March 24,

2018, Rose sent another non-emergency health care request complaining of acute back pain and sent a communication to the medical services manager. (Pl.'s Decl. ¶¶ 41-42; Ex. 18, at 10-11.)

On the evening of March 27, 2018, Rose fell off the top bunk again and was admitted to the infirmary for injuries to her face and back. (Pl.'s Decl. ¶ 43; Ex. 13 at 9; Flowers Decl. ¶¶ 16-17; Att. 10.) The next day, Dr. Patton evaluated Rose and noted that she suffered a facial contusion from the fall. (Pl.'s Decl. ¶ 44; Ex. 13 at 10; Flowers Decl. ¶ 18; Att. 11.) Dr. Patton noted "great pain" when Rose was lying down and attempting straight leg raises and minimal pain when she was seated. (Flowers Decl. ¶ 18; Att. 11.) Dr. Patton diagnosed Rose with a mild back strain, ordered a cane and hot packs, and authorized a low bunk restriction for six months. (Pl.'s Decl. ¶ 44; Ex. 13 at 10; Flowers Decl. ¶ 18; Att. 11.)

On March 30, 2018, Rose's back seized up and she fell in the hallway outside her unit. (Flowers Decl. ¶ 19; Att. 10.) Rose was taken to the infirmary, where she complained of sciatic pain and requested stronger pain medication. (Id.) Medical staff prescribed Rose stretching exercises for her back, directed Rose to continue with over-the-counter pain medication, and noted that Rose agreed to medical staff's treatment plan. (Id. ¶ 19; Att. 11.) The next day, Rose completed a non-emergency health care request and stated that the stretches and medication had "brought my pain down to a dull pain and I am able to walk unassi[sted] but I will use the cane until told otherwise[.]" (Id. ¶ 20; Att. 12.) Rose noted that she still experienced "occasional minor spasms" and requested to "be prescribed a stronger NSAID like naproxen or something . . . [to] bring the pain to a zero[.]" (Id. ¶ 20; Att. 12.) On April 6, 2018, Rose saw her provider and identified her pain as a 3 to 4 on a scale from 1 to 10. (Pl.'s Decl. ¶ 48.) Rose received x-rays of her back, which were negative with no changes. (Flowers Decl.; Att. 11.)

///

PAGE 5 – OPINION AND ORDER

On April 29, 2018, Rose fell off the lower bunk and sustained no new injuries. (Pl.'s Decl. ¶ 50; Ex. 18, at 16.) On May 23, 2018, Rose was seen by defendant Dr. Garth Gulick ("Dr. Gulick") for back pain and reported that she was experiencing dizzy spells. (Flowers Decl. ¶ 23; Att. 13.) Dr. Gulick performed an evaluation and concluded that a low bunk restriction was unnecessary. (*Id.*) On May 29, 2018, results from Rose's lumbar spine series showed normal lumbar alignment and no degenerative changes. (*Id.* ¶ 24; Att. 13.)

On June 25, 2018, Dr. Gulick evaluated Rose for pain and tingling, and followed up on her x-rays. (*Id.* ¶ 26; Att. 13.) Rose reported lower back pain of 3 out of 10, general pain of 5 out of 10, and that ibuprofen and Tylenol reduced her pain by half. (*Id.*) Dr. Gulick renewed Rose's prescription for nonsteroidal anti-inflammatory drugs ("NSAIDS") and prescribed Naproxen for pain. (*Id.*)

On June 28, 2018, Rose requested her low bunk restriction be discontinued and signed an informed consent form authorizing expiration of the restriction. (*Id.* ¶¶ 27-28; Atts. 13-14.)

## LEGAL STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

PAGE 6 – OPINION AND ORDER

**DISCUSSION**

**I.    ROSE'S MOTION TO APPOINT AN EXPERT WITNESS**

Before addressing Defendants' motion for summary judgment, the Court evaluates

Rose's motion for appointment of an expert medical witness. (Pl.'s Mot. for Appointment of an

Expert Witness at 1, ECF No. 50.) Rose alleges that she suffered from "preexisting medical

conditions that caused her to have pain in her lower back" and that "after she fell off of the top

bunk multiple times" the pain became worse. (*Id.* at 2.) Rose contends that "the presence of

medical issues requiring expert testimony supports the appointment of an expert witness[.]" (*Id.*)

**A.    Applicable Law**

Federal Rule of Evidence 706 "permits a court to appoint a neutral expert to assist the

court to understand complex, technical, or esoteric subject matter." *Woodroffe v. Oregon*, No.

2:12-cv-00124-SI, 2014 WL 1383400, at *5 (D. Or. Apr. 8, 2014) (citing *Walker v. Am. Home

Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999)). However, "court

appointment of experts is appropriate only in 'rare circumstances' and should be reserved for

'exceptional cases.'" *Herrington v. Elliot-Blakeslee*, No. 2:13-cv-0948-AC, 2016 WL 1420976,

at *4 (D. Or. Apr. 11, 2016) (citation omitted). Courts do not typically appoint experts when the

record has been adequately developed and the evidence or subject matter is not difficult to

understand. *See id.* (noting that "court-appointed experts typically are used in complex litigation

where the record is not clearly developed by the parties," and denying a motion for a court-

appointed expert because the facts were "not particularly complex," the "subject matter or

evidence [was] not difficult to understand," the medical records were "clearly developed," and

an expert witness, who was "well-suited for [the] task," addressed the health risk question at

issue).

Ultimately, a "court's decision whether to appoint an expert is discretionary," but it is well settled that "there is no statutory authorization for a court-appointed investigator for civil litigants proceeding in forma pauperis," *Snow v. Mar*, 785 F. App'x 465, 466 (9th Cir. 2019) (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.7 (9th Cir. 2002)), and courts may not appoint an expert to "represent the interests of one party," *DeJesus v. Godinez*, 720 F. App'x 766, 772 (7th Cir. 2017) (citing *Kennedy v. Huibregtse*, 831 F.3d 441, 443 (7th Cir. 2016)); *see also Woodroffe*, 2014 WL 1383400, at *5 (explaining that "[a] court may not . . . appoint an expert on behalf of an indigent civil party" (citing *Tedder v. Odel*, 890 F.2d 210, 211 (9th Cir. 1989)).

## B.    Analysis

The Court concludes that no rare or exceptional circumstances exist to warrant the appointment of an expert witness under FED. R. EVID. 706.

In light of the medical records provided by both parties, the Court concludes that an expert witness is not necessary for the Court to understand the relevant subject matter. *See Herrington*, 2016 WL 1420976, at *4 (denying a motion for a court-appointed expert and finding that the medical records that the defendants provided in support of their motion for summary judgment were clearly developed). The Court finds that the information provided in discovery is sufficient to assist the Court in understanding Rose's medical history, the objective medical evidence, and the severity and potential impact of Rose's falls on her pre-existing back condition. *See Wallace v. Pierce Cnty. Sheriff's Dep't*, No. 3:19-cv-05329-RBL-DWC, 2019 WL 3736658, at *3 (W.D. Wash. Aug. 8, 2019) (denying a motion for a court-appointed expert where the plaintiff alleged deliberate indifference to his medical needs because "the facts of this case are not extraordinary, and the legal issues are not complex") (citation omitted).

Accordingly, the Court exercises its discretion to deny Rose's motion for a court-appointed expert.

## II.    ROSE'S MOTION TO DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On October 2, 2020, Rose filed a motion asking the Court to deny Defendants' motion for summary judgment on the ground that Defendants had failed fully to respond to her discovery requests. (Mot. to Deny at 1, ECF No. 46.) Rose argues that she "cannot respond to [D]efendants' motion for summary judgment as the facts are in the possession of the [D]efendants." (Mot. to Deny at 2; *see also* FED. R. CIV. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.").)

On October 13, 2020, Rose also filed a motion to compel discovery (ECF No. 56), asserting that Defendants had not responded to her Requests for Admission directed to Dr. Patton, nor her Interrogatories directed to Dr. DiGiulio. (Decl. in Support of Pl.'s Mot. to Compel Discovery at 1, ECF No. 57.) On November 10, 2020, the Court entered an order granting in part and denying in part Rose's motion to compel, and directing Defendants to respond to all pending discovery requests by December 11, 2020. (ECF No. 67.) The Court also notified Rose that she may file another motion to compel if dissatisfied with Defendants' responses to her discovery requests. (*Id.*) Rose has not filed another motion to compel, nor notified the Court that she is otherwise dissatisfied with Defendants' responses. Accordingly, the Court denies Rose's motion as moot.

///

///

### III.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on all of Rose's claims. For the reasons that follow, the Court grants Defendants' motion for summary judgment.

### A.    Exhaustion of Remedies

Defendants argue that that they are entitled to summary judgment on Rose's fourth and sixth claims alleging deliberate indifference to her medical needs because she failed to exhaust her administrative remedies pursuant to ODOC's grievance procedures and the Prison Litigation Reform Act ("PLRA"). (Defs.' Mot. Summ. J. at 12.)

### 1.    Applicable Law

#### a.    PLRA Exhaustion

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as available are exhausted." 42 U.S.C. § 1997e(a). The PLRA exhaustion requirement has a built-in exception by requiring that plaintiffs exhaust administrative remedies that are "available." 42 U.S.C. § 1997e.

In *Ross v. Blake*, the Supreme Court described three circumstances when a remedy is not "available" and therefore a plaintiff need not exhaust administrative remedies before filing suit: (1) the procedure "operates as a simple dead end" because the "relevant administrative procedure lacks authority to provide any relief" or "administrative officials have apparent authority, but decline ever to exercise it[;]" (2) the "administrative scheme [is] so opaque that . . . no reasonable prisoner can use them[;]" or (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 136 St. Ct. 1850, 1859-60 (2016) (citation omitted).

### b.    ODOC's Grievance Review Process

ODOC processes grievances in accordance with Oregon Administrative Rules ("OAR") found in Chapter 291, Division 109.[2] ODOC employs a three-step grievance and appeal process. (Eynon Decl. Att. 2, at 6-9.) Generally, the AIC must file a grievance within thirty days of the alleged condition or incident. (*Id.* Att. 2 at 6, OAR § 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(2).) An AIC may not appeal a grievance that is returned to the AIC on procedural grounds. Instead, the inmate may resubmit the grievance within 14 days if the procedural errors can be corrected. (*Id.* Att. 2 at 7, OAR § 291-109-0160(5).)

An AIC may file an appeal to any grievance response to the functional unit manager. (*Id.* Att. 2 at 8, OAR § 291-109-0170(1)(a).) To do this, the AIC must complete a grievance appeal form and the grievance coordinator must receive the appeal within fourteen calendar days from the date the grievance response was sent to the AIC. (*Id.*, OAR § 291-109-0170(1)(b).) If the first appeal is denied, the AIC may file a second appeal within fourteen days of the date the denial was sent to the AIC. (*Id.* Att. 2 at 9, OAR § 291-109-0170(2)(c).) A decision following a second appeal is final and not subject to further review. (*Id.* Att. 2 at 10, OAR § 291-109-0170(2)(f).)

An AIC cannot file a grievance regarding "[c]laims or issues for which the inmate has filed a Notice of Tort[.]" OAR § 291-109-0140(3)(g). If an AIC files a tort claim notice during the grievance process, the process is terminated according to the relevant administrative rules. (*See id.* Att. 2 at 7, OAR § 291-109-0160(4) ("If at any time the grievance coordinator determines the inmate has pursued his/her issue through state or federal courts, or has filed a

---

[2] OAR Chapter 291 Division 109 was amended on October 18, 2019, but ODOC processes grievances in accordance with the rules in place at the time of the grievance, and therefore the Court applies the rules in place at the time Rose filed her grievances. (*See* Decl. of Arnell Eynon ("Eynon Decl.") ¶ 6; Atts. 2-3.)

notice of tort claim, the grievance process will cease and the grievance will be returned to the inmate.").

### 2.    Analysis

#### a.    Claim Four—Grievance TRCI-2018-03-166

On March 28, 2018, Rose submitted Grievance TRCI-2018-03-166, which corresponds to Rose's fourth claim alleging deliberate indifference by ODOC officials in response to her March 25, 2018, fall. (Eynon Decl. ¶ 23; FAC Att. 2.) On May 9, 2018, Rose was transferred from Two Rivers Correctional Institution ("TRCI") to SRCI. (Eynon Decl. Att. 1, at 2.) TRCI sent a response denying the grievance on May 18, 2018, which was received by SRCI's grievance coordinator on May 31, 2018. (Eynon Decl. ¶ 24.) Rose appealed the denial, and the TRCI Grievance Office received the appeal on June 22, 2018, which was signed and dated on June 10, 2018. (Eynon Decl. ¶ 25.) The TRCI Grievance Office sent Rose a denial letter on June 28, 2018, stating that Rose had failed to file her appeal within the fourteen-day time frame required by the grievance rule. (*Id.*)

Defendants argue that Rose's appeal was untimely because she did not complete her first level appeal within the fourteen-day time limit prescribed by OAR § 291-109-0170(1)(b). (Defs.' Mot. Summ. J. at 3.) Rose acknowledges that she did not timely file her appeal, but she claims that she was unable to do so because the SRCI Grievance Office did not receive the response to Grievance TRCI-2018-03-166 until May 31, 2018, thirteen days after the TRCI Grievance Office sent its response. (Pl.'s Resp. at 9.) Rose asserts that she received the grievance response from the SRCI Grievance Processing Office on June 6, 2018, nineteen days after it was sent to SRCI, and that she was unable to file her appeal until June 10, 2018, because her unit ran out of grievance appeal forms. (*Id.* at 10.)

///

PAGE 12 – OPINION AND ORDER

The Court finds that Rose has demonstrated that the ODOC grievance process was unavailable to her with regard to Grievance TRCI-2018-03-166. The record demonstrates that SRCI did not receive the grievance response until day thirteen of the fourteen-day time frame, and that Rose contacted both grievance offices and explained why she was unable timely to file her appeal. (Pl.'s Decl. ¶ 59; Ex. 17, at 1.) Defendants do not dispute Rose's version of events, nor do they offer evidence to counter her assertions. Thus, the Court finds that Rose was unable to exhaust her administrative remedies through no fault of her own. *See McManus v. Schilling*, No. 2:07cv74, 2008 WL 682577, at *8 (E.D. Va. Mar. 7, 2008) (holding that an AIC whose appeal deadline passed because grievance responses were not timely delivered to him had no available remedy under the PLRA); *Thorns v. Ryan*, No. 07-cv-0218 H(AJB), 2008 WL 544398, at *3-4 (S.D. Cal. Feb. 26, 2008) (finding that the plaintiff's administrative remedy was unavailable where he was transferred to another facility and did not receive his second level response until after the deadline had expired); *see also Harper v. Hawkins*, No. 2:15-cv-00102-MO, 2016 WL 1261052, at *4 (D. Or. Mar. 30, 2016) (concluding that the AIC had no available remedy due to the lack of a grievance form in his unit, and noting that "[t]o be available, a remedy must be available as a practical matter and must be capable of use, at hand") (simplified). Accordingly, Rose was unable to exhaust her administrative remedies regarding her fourth claim.

### b.    Claim Six—Right of Access to the Courts

In her sixth claim, Rose alleges that Defendants interfered with her ability to exhaust her remedies by improperly denying her first appeal of Grievance TRCI-2018-03-166 (as discussed above). (FAC Att. 1.) The Court construes Rose's claim as alleging that Defendants violated her right to seek access to the courts by failing properly to process her grievances. Defendants assert that Rose failed to exhaust her administrative remedies regarding the denial of her grievance appeal and therefore her claim must be dismissed. The Court agrees.

PAGE 13 – OPINION AND ORDER

Rose does not dispute that she failed separately to grieve the denial of her grievance appeal, nor does she allege facts that would warrant an exception to the exhaustion requirement here. *See Clardy v. Jones*, No. 2:15-cv-01241-CL, 2020 WL 6937453, at *1 (D. Or. June 16, 2020) ("If the defendant shows that a prisoner did not exhaust available administrative remedies, 'the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him.'" (quoting *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014))). Therefore, the undisputed facts establish that Rose failed to exhaust her administrative remedies as to her sixth claim, and Defendants are entitled to summary judgment.

The Court notes that even if Rose had exhausted her claim, she fails to state a claim that the improper denial of her grievance appeal violated her right to meaningful access to the courts. "The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities [] as well as a right of meaningful access to the courts." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015). However, AICs do not have a "constitutional entitlement to a specific prison grievance procedure." *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (citation omitted); *see also Fairley v. Shelton*, 664 F. App'x 616, 617 (9th Cir. 2016) (affirming summary judgment on the plaintiff's claim alleging the improper denial of his grievance). Thus, Defendants did not violate Rose's right to seek redress from prison officials by failing properly to process her grievance appeal.

Further, "[t]o establish the denial of access to the courts, plaintiff must present evidence giving rise to a reasonable inference that defendants' conduct resulted in an 'actual injury.'" *Dansby v. Amsberry*, No. 2:18-cv-01606-MC, 2020 WL 7346607, at *3 (D. Or. Dec. 14, 2020) (quoting *Lewis v. Casey*, 518 U.S. 343, 351-53 (1996)). In this context, actual injury "is 'actual

prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim.'" *Id.* (quoting *Nev. Dep't of Corr. v. Greene*, 648 F.3d 1014, 1018 (9th Cir. 2011)).

Rose identifies no injury resulting from the denial of her grievance appeal. Indeed, Rose filed this action, and the Court excused the exhaustion requirement under the circumstances. *See Dansby*, 2020 WL 7346607, at *3 (finding that "defendants' alleged non-compliance with the grievance process would not prevent [a] plaintiff from filing suit or seeking redress for his complaints; it would merely prevent defendants from relying on exhaustion of the grievance process as an affirmative defense in federal court" and dismissing the plaintiff's claim because he "fails to show an actual injury due to the untimely processing of his grievances"); *cf. Alexander v. Peters*, No. 2:15-cv-02179-CL, 2019 WL 2529568, at *3 n.3 (D. Or. Apr. 12, 2019) (dismissing the plaintiff's claim for failure to exhaust his administrative remedies and noting that, regardless of exhaustion, the improper denial of grievances fails to state a claim because "plaintiff does not allege that the allegedly improper denial of any grievance prevented him from bringing a legal claim regarding these issues or otherwise restricted his access to the courts").

For these reasons, Defendants are entitled to summary judgment on Rose's sixth claim.

### B.    Negligence Claim

Rose alleges that defendant Dr. Evans was negligent in prescribing her a sedative medication without also authorizing a low bunk restriction, and she alleges that defendant Troy Bowser ("Bowser"), the former Superintendent of TRCI, "showed negligence by failing to take precautions to prevent inmates from falling out of bed[.]" (FAC at 3.) Defendants move for summary judgment on Rose's negligence claim on two grounds: (1) Rose did not provide Defendants with a timely or sufficient tort claim notice as required by the Oregon Torts Claim Act ("OTCA") and (2) Defendants are immune from suit under the Eleventh Amendment.

1.      **Applicable Law**

The OTCA requires plaintiffs seeking to file claims against an Oregon public body or its employees to provide notice of that claim "within 180 days after the alleged loss or injury." OR. REV. STAT. § 30.275(2)(b). "Failure to give timely notice . . . is fatal to a plaintiff's tort claim against a public body." *Denucci v. Henningsen*, 248 Or. App. 59, 66 (2012).

Under Oregon law, a plaintiff may satisfy the notice requirement by providing "[f]ormal notice," "[a]ctual notice," or by "[c]ommencement of an action on the claim by or on behalf of the claimant within the applicable period of time[.]" OR. REV. STAT. § 30.275(3)-(6). Formal notice and actual notice require a claimant to communicate the "time, place and circumstances giving rise to the claim, so far as known to the claimant[.]" OR. REV. STAT. § 30.275(4)(b) (formal notice); *id.* § 30.275(6) (actual notice). "[T]he plaintiff has the burden of proving that notice of claim was given as required[.]" OR. REV. STAT. § 30.275(7).

2.      **Analysis**

Defendants argue that Rose's tort claim notice failed to comply with OTCA requirements, because: (1) Rose did not file the notice within 180 days of her alleged loss or injury; and (2) the notice lacks sufficient content to give notice of her claims. (Defs.' Mot. Summ. J. at 11.) Rose acknowledges that she did not timely file her tort claim notice but asserts that she "could not do so as it would have resulted in her failing to exhaust her grievances[.]"[3] (Pl.'s Resp. at 11.)

The Court acknowledges that while Rose was required to refrain from filing a tort claim notice until the grievance process was complete in order to exhaust her administrative remedies,

---

[3] The Court notes that neither party submitted the tort claim notice that Rose filed as evidence, and therefore the Court is unable to review the contents of the notice. However, Defendants describe the notice and state that it "alleges negligence by state employees and mentions the July 17, 2017 fall." (Defs.' Mot. Summ. J. at 11.)

she was also required to provide the state with notice of her claim "within 180 days after the alleged loss or injury" in order to preserve any state law tort claims against an Oregon public body or its employees. OR. REV. STAT. § 30.275(2)(b). In *Clardy v. Gilmore*, 773 F. App'x 958, 959-60 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 946 (2020), the Ninth Circuit recognized that this tension between the prohibition on filing tort claim notices during the grievance process and the statutory tort claim notice requirement could render the administrative process unavailable by requiring a plaintiff "to choose between fully exhausting or timely filing a notice of tort claim." *See also Baker v. Or. Dep't of Corr.*, No. 2:14-cv-00769-KI, 2018 WL 2225353, at *4 (D. Or. Feb. 20, 2018) (finding that the administrative grievance process was "effectively unavailable" to the plaintiff who filed a tort claim notice "only ten days or so" before the tort claim notice deadline and the response to the plaintiff's pending second and final grievance was not due until after the tort claim notice deadline would have expired).

However, although the tort claim notice requirement may excuse the exhaustion requirement under certain circumstances, the reverse is not also true. The exhaustion requirement does not excuse a plaintiff's failure to file a timely tort claim notice, because the tort claim notice is mandatory. *See Urb. Renewal Agency of City of Coos Bay v. Lackey*, 275 Or. 35, 40 (1976) ("The pleading and proof of notice sufficient to satisfy the requirements of [the OTCA] is a mandatory requirement and a condition precedent to recovery under the Oregon Tort Claims Act.") (citation omitted).

It is undisputed that Rose's negligence claim arises from her July 17, 2017 fall, and she was required to submit her tort claim notice no later than January 13, 2018. Rose filed her notice on October 25, 2018, well beyond the 180-day time requirement, and therefore she failed to comply with the OTCA's mandatory notice provision. Accordingly, Defendants are entitled to

summary judgment on Rose's state negligence claims. *See Gonzales v. Blanton*, 504 F. App'x 635, 636-37 (9th Cir. 2013) ("The district court properly granted summary judgment on Gonzales' state law claims for negligence and intentional infliction of emotional distress because Gonzales failed to comply with the Oregon Tort Claims Act's mandatory notice provisions.").[4]

### C.      Deliberate Indifference to Serious Medical Needs

Rose alleges that Defendants acted with deliberate indifference to her medical needs by denying her requests for a low bunk restriction and refusing to increase her pain medication. (FAC at 3-5.) Defendants respond that their delay in providing Rose with a low bunk restriction and their refusal to change their treatment approach did not rise to the level of deliberate indifference. (Defs.' Mot. Summ. J. at 14.) The Court agrees.

### 1.      Applicable Law

"Under 42 U.S.C. § 1983, to maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The Ninth Circuit's "test for deliberate indifference to [serious] medical need is two-pronged[.]" *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing *Jett*, 439 F.3d at 1096).

### a.      Prong One—Serious Medical Need

First, the plaintiff must show "the existence of a serious medical need." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle*, 429 U.S. at 104). A serious medical "need exists if failure to treat the injury or condition 'could result in further significant

---

[4] In light of the Court's holding, it does not address whether Defendants are immune from suit under the Eleventh Amendment.

injury' or cause 'the unnecessary and wanton infliction of pain.'" *Id.* (quoting *Jett*, 439 F.3d at 1096). Other indicators of a serious medical need include: "[T]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1991), *overruled on other grounds by WMX Tech., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)).

### b.    Prong Two—Deliberate Indifference

"Second, the plaintiff must show the defendant's response to the need was deliberately indifferent." *Jett*, 439 F.3d at 1096 (citing *McGuckin*, 974 F.2d at 1060). "A prison official is deliberately indifferent under the subjective element of the test only if the official 'knows of and disregards an excessive risk to inmate health and safety.'" *Colwell*, 763 F.3d at 1066 (quoting *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004)). "This 'subjective approach' focuses only 'on what a defendant's mental attitude actually was.'" *Toguchi*, 391 F.3d at 1057 (quoting *Farmer v. Brennan*, 511 U.S. 825, 839 (1994)).

To establish deliberate difference under this approach, a plaintiff must do more than show (1) a difference of medical opinion as to the need to pursue one course of treatment over another; (2) mere negligence in diagnosing or treating a medical condition; (3) medical malpractice; or (4) even gross negligence. *See Toguchi*, 391 F.3d at 1057-60 (explaining that "[d]eliberate indifference is a high legal standard," "[m]ere negligence in diagnosing or treating a medical condition . . . does not violate a prisoner's Eighth Amendment rights," "[a] showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment," and "even gross negligence is insufficient to establish a constitutional violation" (citations omitted)); *Wilhelm*, 680 F.3d at 1122 (explaining that "a plaintiff's showing of nothing

more than a difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference") (citation omitted).

> 2.  **Analysis**
>
> a.  **Low Bunk Restriction**

Rose alleges that Defendants were deliberately indifferent to her serious medical needs by refusing to place her on a low bunk restriction after each fall or injury she experienced while sleeping or accessing the top bunk.

As to the objective prong, Defendants assert that because three out of four of Rose's falls from the bunk bed occurred approximately six months apart, "there does not appear to be evidence of substantial risk sufficient to prove the objective component of deliberate indifference, as it was reasonable to assume that there was not a significant risk of [Rose] falling in her sleep after the January 16 incident." (Defs.' Mot. at 15.) Defendants further argue that, because Rose's prescription for Abilify was discontinued on August 18, 2017, "it would be reasonable for medical staff to assume that the risk of future falls had been greatly reduced after [Rose's] Abilify prescription had been discontinued[.]" (Defs.' Mot. at 15.)

The Court finds that there are disputed issues of material fact as to whether a serious medical risk existed in housing Rose on a top bunk. It is undisputed that Rose fell out of her bunk bed and sustained injuries twice within a two-week period after taking her evening medication. After her first fall, Rose was taken to the emergency room where she was diagnosed with a neck muscle strain and a lumbar paraspinal strain. Rose reported to jail medical staff that she continued to experience acute back pain that affected her ability to sleep and exercise. (Pl.'s Decl. ¶ 34; Ex. 18, at 6); *see Colwell*, 763 F.3d at 1066 (listing as an indicator of a serious medical need "the presence of a medical condition that significantly affects an individual's daily

PAGE 20 – OPINION AND ORDER

activities; or the existence of chronic and substantial pain"); *cf. Whirl v. Tuell*, No. 17 C 0926, 2019 WL 330477, at *4 (N.D. Ill. Jan. 25, 2019) (finding that no low bunk assignment for the plaintiff who suffered from peripheral neuropathy and untreated diabetes was not a serious medical need because the plaintiff was able to exercise, go to the cafeteria, and had strength to pull himself up). Although Rose's prescription for Abilify ended on August 18, 2017, the falls continued. (FAC at 4; Pl.'s Decl. ¶¶ 31, 43.) When viewed in the light most favorable to Rose, a reasonable juror could conclude that a risk of serious bodily harm existed while Rose was housed on the top bunk. *See Holt v. McBride*, 539 F. App'x 863, 865-66 (10th Cir. 2013) ("We agree with the district court that Mr. Holt alleged sufficient facts to show a risk of serious bodily harm by pleading that his medications 'enduce[d] sedation[ ] and heavy sleeping,' and he could fall from the top bunk.").

However, the Court finds that Rose has failed to establish that Defendants acted with deliberate indifference toward this risk of harm. Instead, the record reflects that Defendants approved a lower bed restriction for Rose after her injury-inducing falls from the top bunk. (*See* Pl.'s Decl. ¶ 12 (noting that Rose was temporarily assigned to a lower bunk after her July 2017 fall from the top bunk); Flowers Decl. ¶ 18 (noting that Dr. Patton authorized a six-month low bunk restriction after Rose's fall from the top bunk in March 2018).) Although Defendants denied Rose's requests for a bunk restriction in August and September 2017 and in January 2018, Rose was no longer taking Abilify as of August 18, 2017. (Flowers Decl. ¶¶ 6-9, 13-14; Att. 2.) In fact, it was Rose who requested in June 2018 that the prison discontinue the restriction, and she signed an informed consent form authorizing an early expiration of the lower bunk restriction on June 28, 2018. (Flowers Decl. ¶¶ 27-28; Atts. 13-14.)

///

At most, the record reflects a difference of medical opinion about the ongoing need for a lower bunk restriction. Although Rose may have believed she was entitled to a low bunk restriction earlier and made repeated requests for one, her need for a lower bunk restriction due to the side effects of her medication and her medical condition was a matter of medical judgment. *See Estelle*, 429 U.S. at 107 ("[T]he question whether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."). This difference of opinion between Rose and her medical providers is insufficient to establish deliberate indifference. *See Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (explaining that "a plaintiff's showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference") (citation omitted); *see also Nicholson v. Finander*, No. CV 12-9993-FMO (JEM), 2014 WL 1407828, at *11 (C.D. Cal. Apr. 11, 2014) (finding that defendants were not deliberately indifferent in denying the plaintiff's request for a lower bunk when the plaintiff had been seen by medical providers after he fell from the top bunk, and "his gait was observed to be intact, he had full range of motion of his ankles" and when there was "'no documentation' in Plaintiff's medical records of any medical conditions, anatomical abnormalities, mobility impairments, or medical infirmities that would either establish the medical necessity of a bottom bunk or meet [the] criteria for a bottom bunk"); *Collins v. Warden, London Corr. Inst.*, No. 2:12-cv-1093, 2014 WL 1653130, at *10 (S.D. Ohio Apr. 23, 2014) (stating that the court would not "second guess" a defendant nurse's decision to discontinue a low bunk restriction because it was a "discretionary decision[ ] made by a medical professional," and granting summary judgment in the defendant's favor), *report and recommendation adopted*

*by* 2014 WL 2207706 (S.D. Ohio May 28, 2014); *Holt v. Wermers*, No. 11-cv-01615-PAB-MEH, 2013 WL 328936, at *2 & n.2 (D. Colo. Jan. 29, 2013) (dismissing an Eighth Amendment claim against a prison physician where the plaintiff alleged that the physician knew that "erratic behavior" was a side effect of the plaintiff's medication yet discontinued the plaintiff's low bunk restriction, and holding that the physician's "decision qualifies as a medical judgment and plaintiff's difference of opinion with [the physician] does not rise to the level of a constitutional violation").

Even if Defendants were negligent in failing to authorize a low bunk restriction for longer periods of time, mere negligence is not sufficient to establish an Eighth Amendment violation. *See Farmer*, 511 U.S. at 844 (stating that prison officials are not deliberately indifferent if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," or if they "actually knew of a substantial risk to inmate health or safety" but "responded reasonably to the risk, even if the harm ultimately was not averted"); *see also Holt*, 539 F. App'x at 865-66 (holding that a physician's "alleged failure to determine the side effects [such as heavy sleeping and drowsiness AIC experienced due to medications] d[id] not give rise to an Eighth Amendment claim" regarding AIC's fall from bunk); *Randolph v. Nix*, No. 1:12-cv-00392-LJO-MJS (PC), 2013 WL 4676580, at *4 (E.D. Cal. Aug. 30, 2013) (finding that a delay in providing a low bunk restriction "does not alone suggest" that the defendant was deliberately indifferent "[b]ut instead suggests at most inactionable negligence"); *Felix-Torres v. Graham*, 687 F. Supp. 2d 38, 53 (N.D.N.Y. Oct. 23, 2009) ("Negligently failing to cause a prisoner to be assigned to a lower bunk does not satisfy the subjective element of the legal standard governing claims of deliberate indifference to a serious medical need under the Eighth Amendment."); *Goodson v. Willard Drug Treatment Campus*,

615 F. Supp. 2d 100, 102 (W.D.N.Y. 2009) ("[E]ven if there were sufficient evidence upon which a factfinder could reasonably conclude that defendants were negligent in assigning plaintiff to a top bunk . . . that too would be insufficient."); *but see Hatfield v. Or. Dep't of Corr.*, No. 3:12-cv-00883-HZ, 2014 WL 1323122, at *7 (D. Or. Mar. 31, 2014) (finding that disputed fact issues existed as to whether the defendants acted with deliberate indifference by ordering the plaintiff to a top bunk even though the defendants knew that the plaintiff weighed 330 pounds, had bad knees, and required the use of a CPAP machine).

No reasonable juror could find that Defendants acted with deliberate indifference with respect to Rose's bunk assignment, and therefore Defendants are entitled to summary judgment.[5]

### b.    Inadequate Pain Management

Rose also alleges that Defendants violated her Eighth Amendment rights by prescribing ineffective pain medication and by denying Rose's requests for stronger medication. (*See* FAC Att. 1, alleging that Defendants "refused to do anything for the acute pain I was in"). The Court disagrees.

The record demonstrates that Defendants were responsive to Rose's complaints of back pain. After Rose fell from the top bunk on July 17, 2017, she visited the emergency room where she received a CT scan and medical treatment for her injuries. (Flowers Decl. ¶ 5; Pl.'s Resp. at 1; Ex. 5.) The CT scan revealed no fractures or malalignment in her back or neck, and Rose received Tylenol, ibuprofen, and hot pack treatment for her pain. (Flowers Decl. ¶ 5; Pl.'s Decl. ¶ 7; Exs. 5, 7.) On July 24, 2017, Rose was evaluated at sick call for back pain. Medical staff

---

[5] In light of the Court's entry of summary judgment on the merits, the Court does not reach Defendants' alternative arguments.

noted that Rose was "able to bend over, twist, bend backwards and ambulate without issues" and referred Rose to Dr. Patton for a low bunk request. (Flowers Decl. ¶ 7 Att. 5.)

Dr. Patton examined Rose on August 9, 2017, and observed a normal gait and stance, her reflexes were intact, and her strength was intact in her lower extremities. (Flowers Decl. ¶ 8; Att. 4, 6; Pl.'s Decl. ¶ 19; Ex. 13, at 4.) Rose was seen again by Dr. Patton on September 27, 2017, who reviewed her emergency room results and performed a back exam, the results of which were benign. (Flowers Decl. ¶ 11; Att. 8; Pl.'s Decl. Ex. 13, at 6.)

Between January and March 2018, jail medical staff evaluated Rose multiple times for back pain. (Flowers Decl. ¶¶ 13-15; Att. 8-11.) Progress notes indicate that while Rose continued to experience pain, she exhibited a normal gait, was able to bend at the waist, sit and twist, and her exams were unremarkable. (*Id.*; Pl.'s Decl. Ex. 13, at 7-9.)

After the March 27, 2018, fall, Rose was taken to the infirmary, administered Toradol for pain, and treated for injuries. (Flowers Decl. ¶ 12; Atts. 10-11; Pl.'s Decl. Ex. 13, at 9-10.) Rose was prescribed a hot pack treatment, Tylenol, ibuprofen, and stretching exercises, which Rose reported were helpful in reducing pain. (Flowers Decl. ¶¶ 19-20; Att. 12.)

On April 6, 2018, Rose was evaluated at sick call for back pain. She identified the pain as a 3-4 on a scale of 1-10. (Flowers Decl. ¶ 21; Att. 11.) Several days later, Dr. Patton reviewed Rose's medical chart and noted that x-rays were negative with no changes. (Flowers Decl. ¶ 21; Att. 11.) On May 23, 2018, Dr. Gulick assessed Rose's back pain, and noted negative leg raises and no neurological deficits. On June 25, 2018, Rose was seen by Dr. Gulick to follow up on x-rays, pain, and tingling. Rose reported back pain of 3 out of 10 and general pain of 5 out of 10, and she reported that the Ibuprofen and Tylenol reduced the pain by half. (Flowers Decl. ¶ 26;

Att. 13.) Dr. Gulick renewed Rose's prescriptions for NSAIDS and prescribed Naproxen for pain and inflammation. (Flowers Decl. ¶ 26; Att. 13.)

Although Rose was dissatisfied with Defendants' treatment of her pain and believed she should have received stronger pain medication, a mere difference of opinion with her medical providers does not rise to the level of deliberate indifference. *See Dickson v. Angelozzi*, No. 3:16-cv-01089-HZ, 2019 WL 1048828, at *5 (D. Or. Mar. 4, 2019) (granting summary judgment for the defendants where the record demonstrated that they were responsive to the plaintiff's complaints of pain through medication and treatment); *Weaver v. Bennette Norton/TRCI's TLC Comm.*, No. 2:16-cv-02311-HZ, 2018 WL 4214139, at *7 (D. Or. Sept. 4, 2018) (same); *Arellano v. Sedighi*, No. 15-cv-02059-AJB-BGS, 2020 WL 5877832, at *26 (S.D. Cal. Oct. 1, 2020) ("The Court finds that at most, Plaintiff disagrees with [the medical provider's] course of treatment. Plaintiff's belief that he should have been prescribed something else other than Elavil is at best, a difference of opinion [from the medical provider], and does not rise to the level of deliberate indifference."); *Parlin v. Sodhi*, No. 10-6120 VF (MRW), 2012 WL 5411710, at *4 (C.D. Cal. Aug. 8, 2012) ("[P]laintiff's claim is that he did not receive the type of treatment and pain medication that he wanted when he wanted it. His preference for stronger medication . . . represents precisely the type of difference in medical opinion between a lay prisoner and medical personnel that is insufficient to establish a constitutional violation.").

Further, to establish deliberate indifference, Rose must demonstrate "that the course of treatment" her medical providers "chose was medically unacceptable under the circumstances[.]" *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (citation omitted). Rose does not offer any evidence to demonstrate that Defendants' treatment plan of NSAIDS, naproxen, over the counter pain medications, and stretching exercises was medically unacceptable under these

circumstances. *See Arellano*, 2020 WL 5877832, at *19 (finding that, "at most, Plaintiff

disagrees with [the physician's] medical treatment plan for his severe pain" but that Plaintiff "has

not established that [the physician's] 10 mg prescription of Elavil for pain was medically

unacceptable"); *Nicholson*, 2014 WL 1407828, at *10 (holding that the defendant's "prescribed

course of treatment, while perhaps less effective than [a different medication], was not medically

unacceptable under the circumstances").

No reasonable juror could conclude that Defendants were deliberately indifferent in

responding to Rose's pain symptoms, and therefore the Court grants summary judgment in favor

of Defendants.[6]

## CONCLUSION

For the reasons stated, the Court GRANTS Defendants' motion for summary judgment

(ECF No. 40), DENIES Rose's motion to deny Defendants' motion for summary judgment (ECF

No. 46), and DENIES Rose's motion to appoint an expert witness (ECF No. 50).

DATED this 11th day of March, 2021.

*Stacie F. Beckerman*

_____

HON. STACIE F. BECKERMAN
United States Magistrate Judge

---

[6] In her FAC, Rose alleges that Defendants violated her Fourteenth Amendment rights as a result of their alleged deliberate indifference to her medical needs. However, "the rights of convicted prisoners to humane conditions of confinement and to protection from injury while incarcerated are protected by the Eighth Amendment and not by the Fourteenth Amendment[.]" *Toliver v. Corizon Health*, 3:16-CV-2034-PK, 2017 WL 7360369, at *4 (D. Or. Nov. 7, 2017); *see also Roberts v. Gonzalez*, No. CV 12-2044-JVS (DTB), 2013 WL 4663882, at *8 (C.D. Cal. Mar. 5, 2013) ("The obligations of prison officials to take reasonable measures to guarantee the safety of prisoners and to provide adequate medical care to prisoners fall within the scope of the Eighth Amendment guarantee against cruel and unusual punishment."). Thus, Rose's Fourteenth Amendment claims, which appear to duplicate her Eighth Amendment claims, properly arise out of the Eighth Amendment, not the Fourteenth Amendment. *See Toliver*, 2017 WL 7360369, at *4 (construing the plaintiff's Section 1983 claims as arising under the Eighth Amendment only).

PAGE 27 – OPINION AND ORDER